| | |
|---|---|
| ARTHUR BEATTY, SR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 1:17-cv-02149-TWP-TAB |
| | ) |
| M. PERSON, L. BERGESON, TINA COLLINS, | ) |
| CORIZON HEALTH, WEXFORD MEDICIAL | ) |
| OF INDIANA, | ) |
| | ) |
| Defendants. | ) |

## ENTRY GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DIRECTING ENTRY OF FINAL JUDGMENT

This matter is before the Court on Defendants' Motion for Summary Judgment, Dkt. [48] filed by Defendants M. Person ("Dr. Person"), L. Bergeson ("Nurse Bergeson"), Tina Collins ("Nurse Collins"), Corizon Health ("Corizon"), and Wexford Medical of Indiana ("Wexford") (collectively, "the Defendants"). Also pending are two Motions to Reconsider Denial of Summary Judgment, Dkts. [61] and [62], in which Plaintiff Arthur Beatty, Sr. ("Mr. Beatty") seeks reconsideration of the Court's Entry denying his prior motion for partial summary judgment and request for injunctive relief, (see Dkt. [44]). Mr. Beatty filed this action pursuant to 42 U.S.C. § 1983, alleging each of the Defendants violated his Eighth Amendment rights. For the following reasons, the Defendants' Motion for Summary Judgment, Dkt. [48], is **granted** and Mr. Beatty's Motions to Reconsider, Dkt. [61] and Dkt. [62], are **denied.**

## I.     LEGAL STANDARDS

### A.     Summary Judgment Standard

A motion for summary judgment asks the court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law. *See* Federal Rule of Civil Procedure 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially relevant in the granting of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The court views the record in the light most favorable to the non-moving party and

draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trustees of Indiana University,* 870 F.3d 562, 573-74 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson*, 477 U.S. at 255.

## B.    Reconsideration Standard

Motions to reconsider "serve a limited function:  to correct manifest errors of law or fact or to present newly discovered evidence." *State Farm Fire & Cas. Co. v. Nokes*, 263 F.R.D. 518, 526 (N.D. Ind. 2009). A motion to reconsider is appropriate where the court has misunderstood a party, where the court has made a decision outside the adversarial issues presented to the court by the parties, where the court has made an error of apprehension (not of reasoning), where a significant change in the law has occurred, or where significant new facts have been discovered. *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191 (7th Cir. 1990). A party seeking reconsideration cannot introduce new evidence that could have been discovered before the original motion or rehash previously rejected arguments. *Caisse Nationale de Credit Agricole v. CBI Indus.*, 90 F.3d 1264, 1269 (7th Cir. 1996).

## II. <u>MATERIAL FACTS</u>

Mr. Beatty is a prisoner currently incarcerated at the Correctional Industrial Facility ("CIF") in Pendleton, Indiana. In 2016, he developed a severe foot/ankle injury. He alleges that he received inadequate medical treatment from the Defendants since that time, in violation of his Eighth Amendment rights. Mr. Beatty has sued Dr. Person, Lisa Bergeson, R.N. who was the Health Services Administrator for Corizon, and Nurse Collins for the care they provided (or failed to provide) to him. He has also sued Corizon and Wexford, the companies who contracted with the Indiana Department of Correction ("IDOC") to provide medical care to state prisoners. On March 31, 2017, the contract between Corizon and the IDOC ended, and Wexford became the contracted health care provider on April 1, 2017.

### A.   <u>Medical Record Review</u>

In summary, Mr. Beatty's medical records reflect the following. *See* Dkt. 49-1 (Dr. Person Decl. at ¶¶ 7-23). He first reported symptoms of left ankle pain and swelling on June 15, 2016, using a Request For Health Care form ("RFHC"). Dkt. [49]-2 at 1. In response, nurses provided ibuprofen and an Ace wrap on June 17, 2016. *Id.* at 1, 4. He filed another RFHC on June 22, 2016 stating that he was very flat footed and needed high support gel insoles. He also requested to see a doctor without charge. *Id.* at 5. He received gel insoles on June 29, 2016. *Id.* at 5, 7. Mr. Beatty filed another RFHC on June 27, 2016, stating that his ankle was still swollen and he needed an x-ray. Nurse Bergeson saw him on June 30, 2016, and assured Mr. Beatty he would be seen by the medical provider as soon as the schedule allowed. *Id.* at 8-9. In June, Mr. Beatty was prescribed aspirin for pain. *Id.* at 10.

On July 1, 2016, Mr. Beatty submitted a RFHC stating that the insoles did not help and

requested to be seen by a provider, as well as an x-ray or CT scan. On July 3, 2016, Mr. Beatty was told that he had already been referred to a provider for this issue. *Id.* at 11-12. Dr. Person saw him on July 8, 2016, and Mr. Beatty complained that the gel insoles did not provide enough arch support for his flat feet and that he was in pain. *Id.* at 13-15. Dr. Person assessed pes planus (flat feet) in both feet and noted Mr. Beatty had tried the arch supports provided but he was not getting enough arch height. *Id.* at 14.

On July 24, 2016, Mr. Beatty submitted a RFHC stating that his left ankle had been hurting, but now had a burning feeling. He requested to be seen by a provider and to have an x-ray taken. *Id.* at 16. On July 26, 2016, Dr. Person saw Mr. Beatty for a chronic care visit. *Id.* at 17-21. Mr. Beatty continued to complain of left ankle pain. Dr. Person performed an examination of the ankle and diagnosed a left ankle sprain. He ordered a large lace-up ankle brace for extra stability and submitted a request for physical therapy so Mr. Beatty could learn additional range of motion exercises. In his request for physical therapy, Dr. Person noted that Mr. Beatty had left lateral ankle pain and swelling for four months. The pain had started while he was working in the brake shop, but he had no known acute injury. Dr. Person requested a formal physical therapy visit to see if other conservative measures might be beneficial. *Id.* at 22-24.

The request for physical therapy was approved August 2, 2016, and Mr. Beatty saw the physical therapist on August 5, 2016.[1] *Id.* at 25, 28. The therapist noted that Mr. Beatty previously worked in the brake shop and stood for long hours on a concrete floor and pressed a pedal with his left foot repeatedly. Mr. Beatty was educated on flexibility and strengthening exercises for his foot and ankle and told to try the exercises for a month. *Id.* at 28.

---

[1] Mr. Beatty points out that only a single one-hour visit was prescribed. Dkt. [56] at p. 2.

On August 9, 2016, Mr. Beatty received the large lace-up ankle brace. *Id.* at p. 30-31. During August 2016, he was prescribed aspirin for pain. *Id.* at 32. In September 2016, he submitted three RFHCs reporting continued ankle and foot pain and seeking an x-ray or CT scan. In response, on September 5, 2016, he was scheduled to see the doctor. *Id.* at 33-34.

Dr. Person saw Mr. Beatty again on September 19, 2016 and performed a physical examination. *Id.* at 38-40. Mr. Beatty had moderately reduced range of motion to the left ankle. Dr. Person again assessed an ankle sprain and submitted a request for Mr. Beatty to see an orthopedist due to his failure to improve. *Id.* at 41-45. The request was approved September 20, 2016. *Id.* at 46.

On September 26, 2016, Mr. Beatty saw orthopedist Dr. David Kaehr. *Id.* at 47. Dr. Kaehr believed Mr. Beatty's ankle injury was caused by overuse of the left foot and ankle by operating a machine in the brake shop that required him to wear steel-toed boots and repetitively plantar flex and dorsiflex his left ankle. On examination, Dr. Kaehr noted the following:

> [T]he patient appears to be in no acute distress. His left ankle is definitely swollen compared to the right. He is tender to palpation over the anterior talofibular and calcaneal fibular ligaments as well as over the peroneal tendons. He also complained of pain with passive dorsiflexion of his ankle as well as with active dorsiflexion of the ankle. This pain is anterior over the tendons of the anterior compartment. He is minimally tender medially. The patient has severe pes planus bilaterally. When he stands with his heels together he has marked valgus of his ankles but this is symmetric. He has a 2+ dorsalis pedis and posterior tibial pulse.

*Id.* at 51. Ankle x-rays were taken and were normal except for the pes planus. Dr. Kaehr did not believe that further bracing of the ankle would help. He opined that the best thing for Mr. Beatty was to have custom made arch inserts for his severe pes planus which hopefully would correct his marked ankle valgus and hopefully correct his pain. *Id.* at 52. Dr. Kaehr stated that he would see Mr. Beatty on an as-needed basis. *Id.*

6

On September 27, 2016, Dr. Person followed Dr. Kaehr's recommendations and requested a consultation with Hanger Orthotics, a company that provides custom orthotics. *Id.* at 53-57. The request was approved September 29, 2016. *Id.* at 58. In September 2016, Mr. Beatty was prescribed aspirin for pain. *Id.* at 60.

From September 30 to October 21, 2016, Mr. Beatty submitted three RFHCs requesting a foot soak tub, to speak with the provider about x-ray results, stating that the bone was out of place and still swollen, and then complaining about the wait to see the doctor. *Id.* at 59, 61, 62. Nurse Collins responded to each RFHC and instructed Mr. Beatty to discuss his requests at his upcoming chronic care appointment. *Id.*

On October 27, 2016, Mr. Beatty met with a representative from Hanger Clinic for an evaluation for orthopedic footwear. *Id.* at 65, 69. During October 2016, Mr. Beatty was prescribed aspirin for pain. *Id.* at 70.

On November 12, 2016, Mr. Beatty submitted an RFHC stating his ankle was still hurting and requesting a bottom bunk pass because he could not climb or jump up or down without extreme pain, but Dr. Person informed him that his condition did not meet the bottom bunk criteria. *Id.* at 71-72. Corizon's policy on January 17, 2017 was that inmates with fractures and sprains met the standard qualifications for a bottom bunk pass. Dkt. [56]-2 at p. 6.

On November 17, 2016, Mr. Beatty submitted a RFHC asking whether the shoes had been approved yet and stating that his ankle hurt every day and that he needed relief. Dkt. [49]-2 at 73. On November 28, 2016, Mr. Beatty was told they are still waiting on the estimate before it could be submitted for approval and that Ms. King called Hanger Clinic that day to follow up. *Id.*

On November 24, 2016, Mr. Beatty sent a RFHC stating that he continued to have pain and

swelling and requested an MRI/CT scan to find out what is causing the pain. In response, Mr. Beatty was referred to the doctor for further evaluation. *Id.* at 74-77.

On November 29, 2016, after Hanger Orthotics sent the estimate, Dr. Person submitted a request for Hanger to manufacture and deliver Depth Inlay shoes with custom molded longitudinal/metatarsal arch support. *Id.* at 78-83. The request was approved December 12, 2016. *Id.* at 84.

Mr. Beatty sent a RFHC on December 19, 2016, asking whether he had been approved for the special shoes and asking for an MRI and doctor visit. In response, Mr. Beatty was told he would be seen during his chronic care appointment. *Id.* at 86.

Mr. Beatty received his custom footwear from Hanger Orthotics on December 21, 2016. *Id.* at 87. Mr. Beatty found that the orthopedic boots made his foot problem worse. Dkt. [56] at 2.

In November and December 2016, Mr. Beatty was prescribed aspirin for pain. Dkt. 49-2 at 85, 88.

On January 4, 2017, Mr. Beatty submitted an RFHC requesting to be seen by the doctor as soon as possible about his ankle stating that the bones in his ankle were out of place and requesting an MRI. *Id.* at 89. Nurse Collins instructed him to discuss his issue with the doctor at his upcoming chronic care visit. *Id.* In January and February 2017, Mr. Beatty was prescribed aspirin and Tylenol for pain. *Id.* at 92, 96. On February 11, 2017, he submitted an RFHC and stated he needed a refill on his Tylenol, which was ordered. *Id.* at 93-95.

In March 2017, Mr. Beatty submitted two RFHCs asking if his ankle MRI had been scheduled. *Id.* at 97-98, 100-101. Nurse Collins responded that she was not aware of any

scheduled MRI. *Id.* In March 2017, Mr. Beatty was prescribed aspirin and Tylenol for pain. *Id.* at 103. On March 31, 2017, the contract between Corizon and the IDOC ended, and Wexford became the contracted health care provider on April 1, 2017. Dkt. [49]-1 at ¶ 24.[2]

This action was filed on June 21, 2017.

**B.** **Role of Dr. Person**

Dr. Person was employed by Corizon as the Medical Director at CIF from February 1, 2008 until March 23, 2017. Dkt. [49]-1 at ¶ 2. Dr. Person testified that the medical care and treatment Mr. Beatty received for his left ankle injury and pes planus met or exceeded the standard of care appropriate under the circumstances. *Id.* ¶ 6. Dr. Person initially proceeded with a conservative course of treatment with braces, wraps, and analgesic pain medications.[3]

After Mr. Beatty failed to show improvement, Dr. Person referred him to a physical therapist and then an orthopedist. Dr. Person followed the orthopedist's recommendations and requested custom orthotics, which Mr. Beatty received. *Id.* at ¶ 7. Mr. Beatty states that Dr. Person should have strictly followed the orthopedic doctor's instructions to provide Mr. Beatty arch supports. Instead, Dr. Person ordered "orthopedic boots" for Mr. Beatty. Mr. Beatty states that the boot did not alleviate his foot problem but made it worse. Dkt. [56] at 2.

---

[2] The Defendants' Statement of Material Facts Not in Dispute states, "After April 1, 2017, the Plaintiff continued to be seen by staff on site, had a follow-up x-ray that confirmed the diagnosis of flat feet, and continued to be receive pain medication." Dkt. [49] at 6 (citing "Exhibit 1"). But the Court could not identify Exhibit 1. Dr. Person's affidavit does not support this claim. Exhibit A-1 (*see* Dkt. [55]) is Mr. Beatty's medical records, but there are no pinpoint cites to this 164-page record.

[3] In response Mr. Beatty states that he complained that none of these items worked and that they were a waste of time. He requested an MRI and a visit with a foot specialist to alleviate his pain. Dkt. [56] at p. 1.

Dr. Person testified that he believed an MRI of Mr. Beatty's ankle was unnecessary because the cause of the Mr. Beatty's ankle pain was determined by the orthopedist. Dkt. [49]-1 at ¶ 6. Dr. Person never promised Mr. Beatty an MRI,[4] surgery, a bottom bunk pass, or CT scans.

## C.    Role of Lisa Bergeson

Nurse Bergeson is a Registered Nurse licensed by the State of Indiana since 2013. Dkt. [49]-3. Nurse Bergeson began her employment with Corizon on March 17, 2014. She was employed as the Health Services Administrator ("HSA") during the Corizon contract and remained in that position when Wexford was awarded the contract beginning April 1, 2017. Nurse Bergeson is currently a Regional Manager with Wexford but was employed as the HSA during all relevant times in the Complaint. *Id.*

During her employment as the HSA, Nurse Bergeson was the chief administrative manager of the on-site health services department. *Id.* at ¶ 5. As the HSA for both Corizon and Wexford, her job duties included responding to informal and formal grievances submitted by inmates regarding their healthcare. *Id.*

When Nurse Bergeson received an informal or formal grievance regarding medical care, it was her practice to always pull the inmate's medical packet to review his complaints. *Id.* at ¶ 6. If she was unable to find an answer in the medical packet, she spoke to the medical providers on site to gather more information. This was done to ensure the inmate was receiving medical care. As the HSA, Nurse Bergeson did not have the authority to order a doctor to provide any specific medical treatment or otherwise dictate an inmate's medical care. Although she is an RN, Nurse Bergeson did not formulate treatment plans or override the medical judgment of the medical

---

[4] Mr. Beatty states that Dr. Person told him "I will order one for you … and I am ordering one now." Dkt. [56] at 2.

providers. Her role as HSA was limited to ensuring that the inmate was being seen and was receiving treatment. *Id.*

Mr. Beatty submitted an Informal Grievance on April 13, 2017, in which he stated he needed emergency medical assistance for his left foot and ankle. Dkt. [49]-4 at 1. He stated he had been refused several times only to be placed on the chronic care wait list for 90 days. Mr. Beatty also stated his ankle and foot had been hurting for over a year. *Id.* After receiving this Informal Grievance, Nurse Bergeson reviewed Mr. Beatty's medical packet and confirmed that he had been seen by Dr. Person multiple times for this same issue, and Dr. Person did not deem an MRI or CT scan to be necessary. *Id.*; Dkt. [49]-3 at ¶ 8. Because Mr. Beatty's condition was long-term and stable, Nurse Bergeson notified him his next chronic care appointment was scheduled on or before April 25, 2017, and that seeing Dr. Person at that visit would be the fastest way to have his concerns addressed. There was nothing in Mr. Beatty's medical packet or Informal Grievance indicating to Nurse Bergeson that his condition was urgent or an emergency. *Id.*

Mr. Beatty then filed a Formal Grievance on May 2, 2017. Dkt. [49]-3 at ¶ 9; Dkt [49]-4 at 4. He stated he had been having pains in his left ankle and foot for over a year and the pain had worsened since he received orthopedic boots. He stated that he could not continue to hop to work, church and meals. He wrote that he had complained to the doctor and staff several times about requesting a CT scan or MRI but was refused. Mr. Beatty further complained that he was enrolled in the chronic care clinic, where he was seen every 90 days. Mr. Beatty stated that Dr. Person told him he would order an MRI, but he never did. Instead, he claimed that Dr. Person told him that "they" wanted him to stay in the orthopedic boots a little longer. Mr. Beatty further complained that he was later refused health care by Nurse Collins. *Id.*

Nurse Bergeson investigated Mr. Beatty's Formal Grievance, which included a thorough review of his electronic medical record as well as a discussion with Dr. Person. Dkt. [49]-3 at ¶ 10. Dr. Person told her that Mr. Beatty's next chronic care appointment would be the appropriate time to discuss Mr. Beatty's ongoing condition that had been monitored through the chronic care clinic. At the time of that examination, Dr. Person would determine the appropriateness of requesting a diagnostic test such as an MRI or CT scan. Nurse Bergeson discovered that Mr. Beatty's chronic care appointment was due and notified Mr. Beatty that it would take place as soon as possible. Because Mr. Beatty's complaints were to be addressed at his upcoming appointment, Nurse Bergeson considered his Formal Grievance resolved. *Id.*

Nurse Bergeson reviewed the medical records and did not see any medical emergency on May 11, 2017, as Mr. Beatty claims. *Id.* ¶ 12. Even if there had been an emergency, she did not have the authority to order a doctor or anyone else to provide any specific treatment. In an actual medical emergency, the provider would send the inmate to the emergency room. *Id.* Nurse Bergeson did not oversee, dictate, grant or deny any of Dr. Person's medical orders. Dkt. [49]-6 at p. 2. Nurse Bergeson did not receive any orders regarding sending Mr. Beatty for a CT scan or MRI because Dr. Person did not submit any such orders. *Id.* at ¶ 5.

**D.      Role of Tina Collins**

Tina Collins has been an RN since March 2017. Dkt. [49]-5. Prior to that, she was a Licensed Nurse since 2005. She has 12 years' experience as a nurse. *Id.* Over the course of her career, she has performed physical assessments on numerous patients with ankle injuries, and she is familiar with the nursing standard of care for those injuries. *Id.*

In a response to an RFHC submitted by Mr. Beatty on April 1, 2017, in which he asked if

12

he had been approved for a CT scan or MRI and also asked if he could "get some assistance," Nurse Collins responded, "No, discuss at CCC." *Id.* at 2. This was correct because no CT scan or MRI had been ordered. In addition, Mr. Beatty's concerns regarding his ankle had already been addressed by the provider, and he could be seen at his next chronic care appointment for that issue. Had his concern truly been an emergency or an unaddressed, new, or changed concern, Mr. Beatty would have been seen by the desk nurse doing triage and referred to the provider for his concerns. *Id.*

In reviewing Mr. Beatty's RFHCs, Nurse Collins believed Mr. Beatty's condition was not a serious emergency, and that he was treated appropriately. *Id.* at 3. Nurse Collins describes a serious emergency as including things such as cardiac events, stroke, disfigurement or compound fractures, life threatening injuries, or acute signs/symptoms of life threatening illness. *Id.*

## III. <u>DISCUSSION</u>

Mr. Beatty asserts Eighth Amendment medical care claims against the Defendants. At all times relevant to his claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical

care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman ex rel. Hamilton v. County of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014).

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). *See Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

"A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010). "[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment." *Id.*

For purposes of summary judgment, the parties do not dispute that Mr. Beatty's ankle sprain and flat feet constituted objectively serious medical conditions. Instead, they disagree as to whether the Defendants were deliberately indifferent to Mr. Beatty's ankle and foot problems. Mr. Beatty explains in his reply brief that his claim is based on the Defendants' delay in treating a non-life-threatening but painful condition. Dkt. [56] at p. 2 (citing *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010)). Mr. Beatty asserts that he needed more than an x-ray to show internal tendon damage or even nerve damage. Dkt. [56] at p. 3. He argues that had Dr. Person ordered an MRI or CT scan it would have shown his ankle tissue damage. *Id.* In addition, Mr. Beatty argues that he should have been provided a bottom bunk pass to reduce his pain.

A.     **Dr. Person**

Mr. Beatty alleges that Dr. Person is responsible for not properly investigating the source of his significant ankle pain. Dkt. [9] at 3. The Defendants argue that Dr. Person is entitled to judgment as a matter of law because he was not deliberately indifferent to Mr. Beatty's sprained ankle and flat feet.

The record reflects that Dr. Person treated Mr. Beatty's foot and ankle pain between July 8, 2016 and March 23, 2017 (at the latest), when Dr. Person's employment at CIF ended. *See* Dkt. [49]-1. During this time, Dr. Person initially proceeded with a conservative course of treatment with wraps and analgesic pain medications. When there was no improvement, Dr. Person referred

Mr. Beatty to a physical therapist on July 26, 2016. Mr. Beatty was given an ankle brace in August 2016. When that did not provide relief, Dr. Beatty requested an orthopedic examination in September 2016. The orthopedist, Dr. Kaehr, found that Mr. Beatty's injury was caused by overuse of the left foot and ankle. He also took x-rays which were normal except for the flat feet. Dr. Person followed the orthopedist's recommendations and requested custom orthotics on September 27, 2016, which Mr. Beatty received December 21, 2016.[5] Dr. Person did not order an MRI for Mr. Beatty's ankle because there was no need for one at the time.

Mr. Beatty argues that a prison physician cannot simply continue with a course of treatment he knows is ineffective in treating the inmate's condition. *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (stating "a jury could find deliberate indifference from [defendant's] refusal over a two-year period to refer Greeno to a specialist or authorize an endoscopy."). Mr. Beatty argues that the orthopedic shoes were ineffective and additional medical investigation should have been undertaken. Mr. Beatty asserts that he experienced continuous extreme pain over several months that should have alerted Dr. Person that Mr. Beatty needed an MRI, bottom bunk, CT scan, a lay in, or surgery.

The undisputed record in this case reflects that Dr. Person continually evaluated Mr. Beatty's foot and ankle condition and sought treatment from specialists. Mr. Beatty argues that the consultation form completed by Dr. Person on July 26, 2016 seeking a formal physical therapy visit to see if other conservative measures might be beneficial included a deadline of four weeks for Mr. Beatty to be "reevaluated." Dkt. [55] at 23-24. Mr. Beatty describes this as one of Dr.

---

[5] Mr. Beatty argues in his response that Dr. Person ignored the recommendations of a specialist with regards to ordering arch supports. But the record reflects that after Mr. Beatty returned from the specialist, he submitted a request for Mr. Beatty to receive specifically crafted arch supports. This evidence shows that Dr. Person did not ignore the recommendations of the specialist for arch supports.

Person's broken promises. He is mistaken, the notation on the form directs the reviewer of Dr. Person's physical therapy request to notify Dr. Person immediately if the appointment cannot be held within 4 weeks. Mr. Beatty saw the physical therapist on August 5, 2016, less than four weeks after the July 26, 2016, request. Dkt. [55] at 24, 28.

Mr. Beatty argues that "it took Dr. Person several months to order Beatty some orthopedic boots." Dkt. [56] at 4. He is mistaken. The designated evidence shows that On September 26, 2016, Mr. Beatty saw orthopedist Dr. Kaehr. On September 27, 2016, Dr. Person followed Dr. Kaehr's recommendations and requested a consultation with Hanger Orthotics, a company that provides custom orthotics. The request was approved September 29, 2016. There were delays in obtaining the arch supports (in the form of custom shoes from an outside provider) but those delays are not attributable to Dr. Person. In addition, it was reasonable to give the new shoes the opportunity to improve Mr. Beatty's foot condition. There is no evidence that Dr. Person's treatment was not based on medical judgment.[6] *Norfleet*, 439 F.3d at 396.

Finally, Dr. Person's liability is necessarily limited to the time during which he was employed at CIF. "'Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation. A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.'" *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (*quoting Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) (alteration and emphasis omitted). He cannot be held liable for actions others took

---

[6] Mr. Beatty's response suggests that the Court should recruit counsel to secure expert testimony to determine the real cause of his pain and ankle injury. Dkt. [56] at 3. To the extent this suggestion could be understood as a motion, that motion is denied as untimely. The time to request assistance recruiting counsel for the purpose of completing discovery is before the discovery deadline.

or failed to take when he was no longer employed at CIF. *See e.g., Heard v. Sheahan*, 253 F.3d 316, 318 (7th Cir. 2001) (finding that, even when injury is ongoing, a claim against any particular person accrues immediately when that person loses the ability "to do something about [the plaintiff's] condition"); *Heard v. Elyea*, 525 F. App'x 510, 511 (7th Cir. 2013) (when a person resigns or retires from his public employment, the claim accrues on that date).

Thus, although Mr. Beatty is not entitled to relief from Dr. Person, this does not mean that he could not raise a new claim against his current medical providers if he continues to experience intense pain daily, is required to hop because he cannot use his left foot or ankle, and where the treatment plan is ineffective and unchanging. It was reasonable for the Defendants in this case to give Mr. Beatty's custom shoes time to work. But, if the shoes failed to provide relief this is not necessarily the end of the inquiry. Orthopedist Dr. Kaehr was hopeful that the arch supports would provide the relief Mr. Beatty sought, but noted that he would see Mr. Beatty again as needed. The fact that the source of the pain has been diagnosed is not the same thing as determining that there are no additional avenues of relief available if the arch supports failed to work.

In any event, Dr. Person timely pursued treatment options for Mr. Beatty's ankle and foot conditions while he was employed at CIF. Under these circumstances, he was not deliberately indifferent to Mr. Beatty's serious medical needs and Dr. Person is entitled to summary judgment in his favor.

18

**B.     Lisa Bergeson, RN**

Mr. Beatty alleges that Nurse Bergeson is liable to him because she falsely told him that his grievance was considered resolved, when nothing was done to resolve his issue and because she did not order treatment for his May 11, 2017 "medical emergency".  *See* Dkt. [7] at 1, Dkt. [9] at 3.

Nurse Bergeson argues that she is entitled to judgment as a matter of law because she never disregarded Mr. Beatty's medical needs.  She states that she was not deliberately indifferent in responding to Mr. Beatty's informal grievance and formal grievance.  She investigated his complaints by reviewing his medical packet and speaking to Dr. Person.  Nurse Bergeson determined that Mr. Beatty was receiving appropriate treatment and he could discuss any concerns at his chronic care appointment.  Nurse Bergeson had no power to order anyone to provide any specific medical treatment and she had no reason to believe or suspect that Mr. Beatty was not receiving adequate medical care.

In response, Mr. Beatty argues that he was only scheduled to be seen by the doctor every ninety days for his chronic care appointment and that this large lapse of time caused him pain and mental anguish.  Mr. Beatty asserts that the chronic care appointments were used to mask the fact that he was not receiving medical treatment at these visits and that he was led away in severe debilitating pain.  Even if Mr. Beatty is correct and he was not happy with the care the doctor provided at the chronic care appointment, Nurse Bergeson could reasonably rely on the doctor to provide appropriate care to Mr. Beatty.  It is not her job as a RN to second guess the doctor.  *See McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 887 (7th Cir. 2018) (citing *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) ("Although a medical care system requires nurses to defer to treating

physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."). And given the fact that Mr. Beatty was evaluated by an orthopedic specialist and his recommendations were followed, there was no basis to conclude that Dr. Person's orders were likely to harm Mr. Beatty. For these reasons, Nurse Bergeson is entitled to summary judgment in her favor.

## C.    Nurse Tina Collins, RN

Mr. Beatty alleges that Nurse Collins is liable to him for failing to schedule him for an emergency visit to see her for painkillers and ankle pain between September 5, 2016 and May 31, 2017. Dkt. [9] at 2. Nurse Collins argues that she was not deliberately indifferent for not scheduling Mr. Beatty for an emergency visit between September 5, 2016 and May 31, 2017, because she did not subjectively believe Mr. Beatty's medical condition was an emergency. Nurse Collins understood Mr. Beatty's condition to be longstanding and stable, such that Mr. Beatty had no need to be seen on an emergency basis. Accordingly, Nurse Collins is entitled to summary judgment. *See Farmer*, 511 U.S. at 837 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment.").

In addition, there is no evidence that Mr. Beatty would have received any additional treatment had he been scheduled for an emergency appointment. To the contrary, when Mr. Beatty was seen by Nurse Practitioner Barbara A. Brubaker for his chronic care visit on June 13, 2017, the only additional evaluation or treatment he received for his continuing foot and ankle pain were x-rays of his ankles. *See* Dkt. [49]-2 at 125. The radiology report of the x-ray images reflected no

bony abnormality or degenerative change of the left angle but did reflect "pes planus deformity." Dkt. [49]-2 at 129. Nurse Practitioner Loretta Dawson reviewed the x-ray results of the left ankle on June 27, 2017 and noted that the x-rays showed no acute injury or significant changes, no additional treatment was prescribed. Dkt. [49]-2 at 132. This continued conservative treatment of Mr. Beatty's foot and ankle pain, "suggests that the outcome would not have differed even if an earlier doctor's appointment had been scheduled. The delay, therefore, could not have caused [plaintiff] to unnecessarily suffer pain that could have been mitigated by an earlier appointment." *Cherry v. Eckstein*, 751 F. App'x 940, 942 (7th Cir. 2019) (*citing Greeno v. Daley*, 414 F.3d 645, 651, 655 (7th Cir. 2005) (finding deliberate indifference where delaying patient-requested intervention postponed successful treatment)).

To the extent Mr. Beatty alleges Nurse Collins was deliberately indifferent based upon her responses to other RFHCs in which he requested an MRI or CT scan, those claims fail as well. The record shows that Dr. Person never ordered an MRI or CT scan for Mr. Beatty, so Nurse Collins was providing correct information in responding that those tests had not been ordered. For these reasons, Nurse Collins is entitled to summary judgment in her favor.

## D.    **Corizon and Wexford**

Mr. Beatty alleges that Corizon and Wexford are liable to him for their systemic failures in responding to his medical needs in a timely fashion. Dkt. [9] at 4.

Because Corizon, and now Wexford, act under color of state law by contracting to perform a government function, *i.e.* providing medical care to correctional facilities, Corizon and Wexford are treated as a government entity for purposes of Section 1983 claims. *See Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 766 fn.6 (7th Cir. 2002). Therefore, to state a cognizable

deliberate indifference claim against Corizon or Wexford, Mr. Beatty must establish that he suffered a constitutional deprivation as the result of an express policy or custom of Corizon or Wexford. Mr. Beatty must show that Corizon or Wexford has: (1) an express policy that, when enforced, causes a constitutional deprivation; (2) a practice that is so wide-spread that, although not authorized by written or express policy, is so permanent and well settled as to constitute a custom or usage with the force of law, or (3) an allegation that the constitutional injury was caused by a person with final policy making authority. *Estate of Moreland v. Dieter*, 395 F.3d 747, 758-759 (7th Cir. 2004). In addition, the failure to make policy itself may be actionable conduct. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 381 (7th Cir. 2017).

The Defendants argue that Corizon is entitled to summary judgment because Mr. Beatty has not presented evidence that Corizon had a policy or custom that infringed upon his constitutional rights and caused him harm. Mr. Beatty did not experience any inordinate delay in his medical treatment that amounts to a violation of his constitutional rights. And while Mr. Beatty may be proceeding on a claim alleging systemic failures in responding to his medical needs in a timely fashion, he cannot rely on the circumstances surrounding his own medical treatment to establish the existence of a policy or practice. *See Phillips v. Sheriff of Cook Cnty.*, 828 F.3d 541, 557 (7th Cir. 2016) (citing *Holmes v. Sheahan*, 930 F.2d 1196 (7th Cir. 1991)). Accordingly, Corizon is entitled to summary judgment.

Similar to Corizon, Wexford is also entitled to summary judgment, as Mr. Beatty has no evidence of any policies, practices or procedures of Wexford that led to a violation of his constitutional rights.

Mr. Beatty's response in opposition to summary judgment argues that Corizon and

Wexford are liable because these companies should have known of the "acts" committed by their employees, and that these acts amounted to deliberate indifference to his medical needs. This argument is not persuasive. "Under existing precedent, neither public nor private entities may be held vicariously liable under § 1983." *Collins v. Al-Shami*, 851 F.3d 727, 734 (7th Cir. 2017) (*citing Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978) (discussing municipal liability); *Iskander v. Vill. of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982) (extending *Monell* to suits against private corporations)).

Because the undisputed evidence shows that Mr. Beatty has not presented any evidence of any widespread custom of delaying medical treatment, Corizon and Wexford are entitled to summary judgment in their favor.

**E.    Motions to Reconsider**

Mr. Beatty filed a partial Motion for Summary Judgment/Preliminary Injunction seeking injunctive relief, Dkt. [30], very early in the proceedings, before Defendants were able to engage in discovery. The Court denied the motion as premature and noted that the Defendants correctly pointed out that the pretrial schedule was entered less than a week before Mr. Beatty filed his motion. Because the Defendants were not yet able to properly support or refute Mr. Beatty's assertion of fact, the Court denied his partial motion for summary judgment **without prejudice** pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. See Dkt. [44]. Mr. Beatty then filed Plaintiff's Motion to Reactivate Summary Judgment, dkt. [46], which the Court denied. See. Dkt. [60]. He now asks the Court to reconsider that ruling.

Motions to reconsider filed pursuant to Rule 54(b) and Rule 59(e) are both for the purpose of correcting manifest errors of law or fact, or to present newly discovered evidence not available

at the time of briefing. *See Woods v. Resnick*, 725 F. Supp. 2d 809, 827 (W.D. Wis. 2010) ("[M]otions to reconsider an order under Rule 54(b) are judged by largely the same standards as motions to alter or amend a judgment under Rule 59(e)."). Mr. Beatty's motions do not show that the Court made a manifest error of law or fact, or that the Court has made an error of apprehension. He also has not pointed to new intervening case law or newly discovered facts that would affect the outcome of this case. Rather, Mr. Beatty uses his motions as an opportunity to re-argue the issues using the same facts and arguments asserted in his prior motions, and he argues that the Court has made an error of reasoning. As the Seventh Circuit has clearly stated, "[r]econsideration is not an appropriate forum for rehashing previously rejected arguments or arguing matters that could have been heard during the pendency of the previous motion." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996). The Court fully took into consideration Mr. Beatty's arguments and evidence (including his Affidavit at dkt. 47-1) and concluded, after careful consideration, that his motion to reactivate summary judgment should be denied. In considering the evidence in the light most favorable to Defendants, there was evidence in the record that could result in a verdict for defendants. Because the Court has determined that summary judgment is warranted on behalf of the Defendants, reconsideration is not warranted and his motions to reconsider must be **denied**.

## IV.  CONCLUSION

The Court is sympathetic to Mr. Beatty and the fact that he has been in pain for some time. Although Mr. Beatty's ankle injury and flat feet were serious medical needs, the undisputed facts show that Defendants were not deliberately indifferent to those needs. As the Court noted, Mr. Beatty may file a new claim against his current medical providers if he continues to experience intense

pain daily. The Court is hopeful that Defendants (some of whom are current providers) will take greater care to help alleviate the pain that Mr. Beatty has experienced. For the reasons explained above, the Defendants' Motion for Summary Judgment, Dkt. [48], is **GRANTED.** Judgment consistent with this Entry shall now issue.

Mr. Beatty's Motions to Reconsider Denial of Summary Judgment, Dkt. [61] and Dkt. [62], are **DENIED.**

**SO ORDERED.**

Date: 3/20/2019

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Arthur Beatty, Sr., #876231
Correctional Industrial Facility
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com